## DENNY v. UNITED STATES.
### No. 6766.

Circuit Court of Appeals, Seventh Circuit.
April 1, 1939.

Rehearing Denied May 18, 1939.

Edward H. S. Martin and John B. King, both of Chicago, Ill., for appellant.

Julius C. Martin, Wilbur C. Pickett and Young M. Smith, all of Washington, D. C., and Wm. J. Campbell and Wm. M. Lytle, both of Chicago, Ill., for appellee.

Before EVANS, SPARKS, and MAJOR, Circuit Judges.

SPARKS, Circuit Judge.

This is an appeal from a judgment on a directed verdict in favor of the Government. Appellant was a world war veteran, and his action arose out of the denial of his claim for permanent total disability benefits. This claim was made under his contract of war risk term insurance which was in force from February 1, 1918, to December 1, 1918, and from March 1, 1919, to December 31, 1920. His claim was also based upon a twenty-year endowment policy of United States Government Life (converted) insurance which was in force through premium payments from January

1, 1921, to February 28, 1923; from May 1, 1923, to February 28, 1925; and from July 1, 1926, to August 31, 1926. On November 22, 1926, appellant surrendered the endowment policy for its cash value of $2,-221.01. At that time the policy was subject to a loan lien of $2,046, and upon the surrender of the policy to the Government it paid him $175.01.

Appellant's claim for permanent total disability benefits was filed October 28, 1930. It was denied by the Veterans' Administration on September 16, 1936, and this action was instituted September 26, 1936. The claim alleged that he became permanently totally disabled on October 1, 1918, or on December 25, 1924, as a result of the following ailments: General tremor, chronic, progressive; psychoneurosis; neurasthenia; hysteria; effects of pneumonia; nervousness; general weakness; general disability and other ailments, the exact nature of which was unknown to appellant. The record discloses that appellant since childhood had been affected with crossed-eyes, had a deformity of the left arm, had been nervous, and was handicapped by congenital mental deficiency. He had a large and peculiarly shaped head, and a mask-like expression. Although not naturally seclusive, he had not been able to make friends or mix with those with whom he came in contact. He attended high school and college but failed to complete his work in either.

Appellant's testimony discloses that his father owned a farm of 2,000 acres in Iowa; that prior to his enlistment appellant weighed crops on this farm and saw that they were paid for by the elevators; that he did nothing of much consequence on the farm after his father's death in 1915, but he did as much as he could.

Appellant enlisted in a hospital detachment of the army at Camp Dodge, Iowa, on December 14, 1917, at which time he was thirty-one years of age. He was assigned to limited service as a mail orderly at Camp Upton, New York. During his ten months' army service, he spent a total of four months in the hospital. During six weeks of this time he was treated for lobar pneumonia. During the remainder of his hospitalization he was observed with respect to his mental and neurological condition which was variously diagnosed as general tremor, constitutional psychopathic state, inadequate personality, mental deficiency (moron), and constitutional inferiority, all of which were found to have existed prior to his enlistment.

He was discharged October 7, 1918, and his certificate of disability, of the same date, disclosed that his occupation was farming; that he was recommended for discharge on account of general tremor, chronic, progressive; that he became unfit for duty from his then present disease which had existed for more than three years previously, and prior to his entrance into military service. It further stated that his disability was not incurred in the line of his military duty.

Following his discharge from service he worked for a short time at the Rock Island Arsenal from which employment he was discharged after a handtruck which he was operating damaged a time clock. He then returned to Burlington, Iowa, thereafter working at various odd jobs for indefinite periods of time, at a number of places from Indiana to the Pacific coast. These jobs included farm work, yard and garden work, logging, dishwashing, freight handling, railroad track work, cemetery attendant, and soliciting funds for a charitable organization in Chicago. This work continued intermittently until in the year 1930. Since then he has done no work, and he quit no job voluntarily. In explaining his delay in filing his claim for disability compensation until 1930, he said: "The reason I didn't apply for it before was not because I didn't need it." He was paid retroactive compensation in the amount of $1,245 in 1931, and thereafter until June, 1935, he received amounts varying from $25 to $100 a month.

Appellant's witness, Anderson, testified that he had known him in Iowa but that he had not seen him from 1912 to 1925. Since 1925 he had seen him at least once a month and perhaps more frequently, at which times he appeared to be nervous, had a shaky walk, and when he exerted himself he tired easily; that he had never seen him work since the war. He helped support him during 1927, 1928, 1929 and 1930, by giving him meal tickets and money which aggregated $400.

The record discloses that appellant was neither examined nor treated by a physician from the time of his discharge in 1918 until after he had applied for compensation in 1930. He was examined April 8, 1930, at Hines Hospital in Illinois, where he was given a diagnosis of psychoneurosis neurasthenia, and hospitalization was recom-

mended. On April 9, 1930, he was admitted to the Great Lakes Naval Hospital, from which he was discharged August 29, 1930. The examination there disclosed that he had no tremors of consequence. The mental examination was as follows:

"Expression—suspicious, on entering examining room. Well oriented, in all spheres. Memory, poor, for remote events, however, patient is not willing to talk much, because he has a lawsuit pending with relatives. Attention, easily gained and held. Judgment, fair. Denies hallucinations, delusions, compulsions and phobias. Mental age, below average for one of his education. Emotional reaction, fairly stable. Mental attitude and mannerisms: Is rather hostile when questions are asked about his family and personal affairs. Reaction to educational tests, fair. Social Reaction: Not married because of financial reasons. Has been working as a collector, for a missionary organization. Was to receive between fifty and one hundred thousand dollars from father's estate, but brother and sister, in conjunction with another man, have beat him out of it. At present time has a lawsuit pending. After considerable conversation with patient, he suddenly becomes very confidential, and loses the suspicion and antagonism shown at outset of examination. Patient badly in need of bath; is untidy, in dress and habits. Linen, badly soiled."

The final diagnosis was "psychoneurosis, neurasthenia, moderate, not permanent—treated, improved." He was recommended for discharge as having reached the maximum benefit of hospitalization.

Subsequent diagnoses were as follows:

July 16, 1931. Dementia praecox, simple type. Incompetent.

March 25, 1932. Dementia praecox, simple type. "Patient is unable to make proper adjustment outside of the hospital without intelligent supervision. Continued hospitalization with domiciliary care is recommended. Patient is considered incompetent."

March 28, 1934. Dementia praecox, simple type—not requiring supervision. Competent.

March 22, 1935. "The present examiner is of the opinion * * * that frankly the diagnosis stands between a constitutional psychopathic inferior with episodes and a dementia praecox of a paranoid type. * * *"

August 7, 1936. "On reviewing a longitudinal section of the case and social data in file, it is found that this veteran has always been an inadequate, inefficient type of personality and that this condition has not progressed, being of constitutional origin. The only difference noted is that he is growing older. * * *" Diagnosis: Constitutional psychopathic state. Inadequate type of personality.

Dr. Hershfield, a neuropsychiatrist, who was appellant's witness, examined him on November 2, 1934, and on numerous occasions thereafter, and testified as follows:

"On those examinations which I made I found his face had a stiff, stony masklike expression, his knee jerks were brisk, he spoke slowly, almost in a monotone, he was crosseyed, nervous, seclusive, had ideas that his relatives and others had defrauded him out of his share in his father's estate, or were trying to do so. He was very suspicious of everyone, including myself. * * * He had tremors, stiff gait, exaggerated ideas, hallucinations, ideas that someone was harming him or attempting to do so.

"* * * General tremors are a symptom and not a separate distinct disease. They may arise from various causes. A constitutional psychopathic state is congenital, but the disabling state of it does not usually exist from birth. The condition usually becomes aggravated. It is a functional mental disorder and not an organic one. * * * but functional disorders are real, just the same, and disabling. They are not sham or voluntary.

"From the objective matter which I found at the times I have examined the plaintiff and at the various other times I have seen him, it is my opinion that at all those times he has been suffering from a constitutional inferior with paranoid ideas and also has some organic changes in the brain and spinal cord that accounts for the physical symptoms I found, and that during all that time his condition has been such that it will continue without improvement during his lifetime. In my opinion, if he would attempt to engage in sustained physical effort he would become exhausted and unable to continue it for more than a half hour at a time, when he would have to rest, and would even then not be able to continue for more than sometimes a few days and sometimes two or three weeks, and occasionally, perhaps, a month or two. In my opinion, from the same observation, if the plaintiff would attempt to engage in mental exercise or effort, he would not be able to continue at it for more than a half hour or an hour,

and would tire mentally and would be able to do less towards the end of the time, and would probably blow up mentally at the end of that short period. * * *"

A hypothetical question reciting the various findings and diagnoses in 1918 and 1930, and thereafter, was put to this witness, to which question he answered:

"Assuming all these things, my opinion is that while he was in the army the condition of this hypothetical man was a constitutional psychopathic state with delusions; that it is now and was from October 7, 1918 reasonably certain to continue throughout his life, and attempting to engage in sustained mental effort or sustained physical effort would have had the same effect upon him that I have testified it would have had upon the plaintiff."

Upon cross-examination this witness testified:

"Engaging in soliciting would not impair his health when in a state of remission. I do not know whether he could get about the country himself and get jobs for himself. If he obtained a job at a Masonic Home and kept it for six months and was paid $60.00 a month besides room and board, such sustained effort would not hurt him because he was in a state of remission. That would be my supposition. There is nothing in the hypothetical question which would indicate that the hypothetical man could not have been in a state of remission from fall of 1918 until April, 1930. On February 25, 1935, my examination was physical more than mental. I did not elicit any symptoms of delusions or hallucinations. He answered questions to the point and was cooperative and his judgment was good. * * *"

This witness further testified that he had known people with psychopathic personalities engaged in occupations. Where there is a necessity for work they work for short periods of time, but not for long. Somehow or other such persons get along without working. They follow the lines of least resistance and get along. They would rather get along without working.

Dr. Hulbert, a psychiatrist and neurologist, another witness for appellant, examined him May 24, 1935. His testimony was much the same as that of Dr. Hershfield, and he stated that appellant's condition then would be reasonably certain to continue throughout his lifetime; that the condition then had been present for many years, certainly more than seven, but he was unable to state definitely.

Appellant contends that the court erred in striking out his testimony that he was discharged from all jobs held by him. If this were error, it was subsequently corrected when the court permitted him to testify that he did not quit any job voluntarily.

He further contends that the court erred in refusing to permit the witness, Anderson, to answer the following question: "From what you observed of him at the times you have seen him since the war, have you an opinion as to his ability and inability to work with any degree of steadiness at such times?" The witness answered, "Yes." Thereupon he was asked to state that opinion, whereupon the court sustained appellee's objection to it. This question included all kinds of work and the objection was properly sustained.

The principal question presented to us is whether or not there was substantial evidence to go to the jury with respect to appellant's total and permanent disability, and whether such disability should be considered as of December 31, 1920, when his original policy of war risk insurance expired, or December 31, 1926, when the period of grace on his converted surrendered policy expired.

Section 307 of the World War Veterans' Act, 38 U.S.C.A. § 518, provides: "* * * That the insured under such contract or policy may, without prejudicing his rights, elect to make claim to the bureau [Veterans' Administration] or to bring suit under section 19 of this Act [section 445 of this title] on any prior contract or policy, and if found entitled thereto, shall, upon surrender of any subsequent contract or policy, be entitled to payments under the prior contract or policy: * * *." It is by virtue of this language that appellant was enabled to sue on his original war risk contract. In United States v. Arzner, 57 F.2d 488, 489, affirmed in 287 U.S. 470, 53 S.Ct. 238, 77 L.Ed. 436, the Circuit Court of Appeals for the Ninth Circuit in construing this language said: "These provisions in favor of the veteran were very liberal and definitely and purposely abrogated the rules relating to civil contracts ordinarily applicable to insurance policies. By this legislation the government not only waived its immunity from suit, but also waived the defenses which might have been advanced by an insurance company."

It will be noted, however, that this section did not create a liability nor permit payment on a contract of insurance which had been fully performed and fully executed, and we find no authority to hold the Government liable in this case under the Twenty Year Endowment policy which was surrendered for its cash value by appellant on November 22, 1926. Appellant relying on this policy contends that it was only necessary for him to establish the required disability prior to January 1, 1927, which was the expiration date of the grace period following the surrender of his converted insurance for its cash withdrawal value. We think appellant is in error in this conclusion, because his claim that he became permanently and totally disabled subsequent to December 31, 1920, is based upon the converted policy which was satisfied by his surrender of it. This, however, did not prevent him from recovering on his original war risk insurance contract, and to have his case submitted to the jury for determination, provided there was substantial evidence presented to show the required disability under the Act. United States v. Arzner, supra.

A study of this record convinces us that there was no substantial evidence to support appellant's claim for total permanent disability prior to December 31, 1920, which was the last effective date of his war risk term contract.

The burden was on appellant to establish his total and permanent disability from December 31, 1920, and yet this record discloses no substantial evidence, except by inference, that he was totally and permanently disabled from October 7, 1918, to April 8, 1930, and his own witness, Dr. Hershfield, testified that during that time his dementia praecox might have been in a state of remission. He further stated that the work which appellant did during that period would not impair his health. There can not be much doubt that appellant has been permanently disabled since April 8, 1930, and his condition has been quite deplorable. Under the evidence, however, the court is not warranted in concluding that this condition existed, and that he was totally and permanently disabled either at the time that his war risk contract was converted into the endowment policy or at the time the endowment policy was surrendered. To warrant such a conclusion would be to indulge in inferences which the undisputed testimony in this case does not permit. It is quite probable that appellant was suffering from dementia praecox when he received his discharge, but it is undisputed that this disease has its periods of remission during which times the patient may work without injury to himself. This we think is what the evidence discloses. Under these circumstances we are convinced that the District Court did not err in directing a verdict for the Government.

Judgment affirmed.